**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| WOODLAWN COMMUNITY | ) | Case No. 18-29862 |
| DEVELOPMENT CORP., an Illinois | ) | |
| not for profit corporation, | ) | Hon. Carol A. Doyle |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF DR LEON FINNEY JR. IN SUPPORT OF**
**THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Dr. Leon Finney Jr., declare:

I am over 18 years of age and, if called as a witness, could and would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below:

**BACKGROUND**

1.    I am the President and CEO of the Woodlawn Community Development Corp. (the "Debtor' or "WCDC"), an Illinois not for profit corporation I am intimately familiar with the business operations and assets of the Debtor.

2.    I hereby submit this declaration in support of the following pleadings filed by Debtor:

(a)    Voluntary Petition and documents filed in support thereof.

(b)    Motion of the Debtor for Entry of an Order Pursuant to Sections 105(a), 363 and 345 of the Bankruptcy Code Authorizing the Debtor to Maintain and Use its Existing Payroll Bank Account at PNC Bank and Waive the Requirements of Section 345 of the Bankruptcy Code with respect to the Payroll Account (the "Cash Management Motion").

(c)    Debtor's Motion for Entry of Order Pursuant to Sections 105(a), 363(b), 363(c),

507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages, Compensation and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefit in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process Honor and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing (the "Wage Motion").

3. I supervise the custodians of the books and records of the Debtor relating to financial and commercial transactions and am familiar with the Debtor's procedures for maintaining records and files and recording transactions into the Debtor's books and records. The books, records and files of the Debtor are maintained in the normal course of business, with all of the entries made by the Debtor's employees at or about the time the events that were recorded therein occurred. Unless otherwise indicated, all statements below are based on the contents of the Debtor's books, records and files.

4. In 1960, a group of religious and block club leaders brought together a coalition of over 100 neighborhood associations, religious institutions and civic organizations to fight against the deterioration of the Woodlawn community located on the south side of Chicago and adjacent to the University of Chicago. The organization which was created was The Woodlawn Organization ("TWO") whose purpose was to revitalize this inner city neighbor by focusing on housing, health, education, employment, economic development, physical and infrastructure development and the provision of social services in the community. To further these goals, WCDC was created in 1972 to serve as the umbrella for TWO's real estate development and management activities. Initially, WCDC undertook the aggressive redevelopment of a 30-acre tract of land between 60th and 65th

Streets, Stony Island and the IC/Meta train tracks. This entire area was an individual sub-component of the "TWO Model Cities Plan". Neighborhood residents and community-based groups were organized and brought to a common table for the purposes of visioning and creating a strategic approach for the area with individuals who had the skills and the expertise to make their vision become realities.

Over the ensuing years WCDC has completed ten (10) development construction projects at a total cost of $82.5 million dollars. WCDC is continuing to impact the community in a positive way with a holistic approach to property management of over one thousand seven hundred private rental apartments for low, moderate and middle income families, senior citizen's, socially and physically challenges in eleven properties. Currently, the Debtor serves as property manager for over forty eight hundred public housing rental apartments for families and senior citizens in fourteen properties.

Moreover, WCDC has created opportunities for neighborhood associations, churches, local agencies and community organization to engage in communication and dialogue and to become stakeholders in the redevelopment of their areas. On several occasions WCDC has also integrated local area developers and independent contractors into the planning process.

WCDC was chosen in 1999 to receive the Chicago Association of Realtors *Good Neighbor Award*. WCDC. was recognized for the property *Kenwood Pointe*, located at 65th and Kenwood. Once a year, the Chicago Association of Realtors gives the Good Neighbor Award to property managers/developers who, through rehabilitation or new construction of commercial, retail or residential properties, manage to impact the surrounding neighborhood in a positive way. WCDC has demonstrated its leadership in bringing market rate housing into the community with the development of its single-family town homes *"The Homes at Blackstone"* at 63rd Street &

Blackstone and its collaboration with All Chicago and The FUND Group in the development of "Columbia Pointe" at 63rd Street between Kenwood and Kimbark Avenues.

Unfortunately, in the last several years, the Debtor has been plagued with numerous lawsuits which have consumed time and substantial financial resources. Although WCDC has either settled or is currently litigating these claims, the Debtor has been able to manage the litigation without resort to bankruptcy protection. However, the claim which precipitated the Debtor's filing for Chapter 11 reorganization is the recent claim and filing of federal tax liens by the Internal Revenue Service totally approximately 1.8 million dollars for unpaid payroll tax liability for the 2nd and 4th quarters of 2017 and the 1st quarter of 2018. Management was completely surprised by these unpaid tax liabilities because provision has always been made for payment of these liabilities at the time employees receive their payroll checks. Accordingly, as part of the Chapter 11 process, the Debtor has engaged and will seek to employ a forensic accountant to determine the disappearance of funds which were earmarked for the payment of these tax liabilities for the quarters in question. Because of the imminent threat of an IRS tax levy which would severely impact on its management activities, Debtor filed this case seeking bankruptcy protection.

5.      The Debtor operates it business in an office space which it rents and is located at 6040 S. Harper Ave., Chicago, Illinois 60037. WCDC currently employs approximately 177 persons. Currently, the Debtor's yearly gross revenues are about 2.5 million dollars with total assets of around 65.6 million dollars and liabilities of approximately, 50 million dollars.

6.      The Debtor has four (4) secured creditors which hold various mortgages and fixture lien filings with respect to the various real estate properties owned by WCDC. To the best of my knowledge, no creditor has a security interest in any of the accounts receivable or accounts of WCDC.

7. The Company is continuing in possession of its property, and is operating and managing its business as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## SUPPORT FOR FIRST DAY MOTIONS

### Petition

9. I have reviewed the information in the Debtor's voluntary petition and documents filed in support thereof, and they are true and accurate to the best of my knowledge.

### Use of Existing Payroll Account Motion

10. As of the Petition Date, the Debtor maintains three checking accounts at PNC Bank. As of the Petition date, the Debtor will sweep the monies from it Operating and General Account into an newly established Debtor in Possession Account. However, the Debtor seeks authority to continue to use its existing Payroll Account.

11. The Debtor utilizes its Payroll Account for the sole purpose of funding its bi-monthly payroll obligations. A few days prior to the distribution of checks to employees, WCDC deposits a check from its operating account into the Payroll Account; the deposit is sufficient to cover all wages and required federal and state tax deposits as determined by its payroll service, ADP. In turn, ADP automatically debits the Payroll account prior to issuing the payroll checks and making all necessary federal and state tax deposits. I believe that the Payroll Account is in a financially stable banking institution with the Federal Deposit Insurance Corporation or other appropriate government-guaranteed deposit protection insurance.

12. Requiring the Debtor to close its existing Payroll bank account would not be in the

best interest of the estate, as it would (a) be costly, (b) disrupt the Debtor's ability to quickly, easily and accurately meet its payroll obligations and the payment of all payroll taxes, and (c) interfere with the efficient management by ADP of Debtor's payroll obligations.

### Motion for Payment of Pre-Petition Payroll

13. The Debtor currently employs approximately 177 employees. These employees are involved in numerous activities involving the maintenance and management of the properties owned and/or managed by WCDC.

14. The Debtor's payroll is distributed on a bi-monthly basis with the next payroll due to be distributed to employees on October 30, 2018. Because WCDC filed its voluntary petition on October 22, 2018, employees will be entitled to compensation based, in part, on pre-petition work and expenses. With respect to each employee, none of the pre-petition wages, expenses, or benefits exceed the sum of $12,850.

15. In order to not interfere with the normally functioning of business operations it is essential that each of these employees receive their pre-petition wages. Moreover, many of these employees are dependent on receiving the full amount of their wages and the failure to pay many of these employees their pre-petition wages would be economically harmful to them.

Dated: October 24, 2018

Dr. Leon Finney, Jr.
President & CEO